Per Cueiam.
In January, 1808, Cockrill obtained judgment against R. 0. Reeves, in the County Court of Davidson. Reeves appealed, and Hoggatt and Jackson became his sureties for the appeal. To indemnify them, Reeves mortgaged to them 110 acres of land on Mill Creek, and other property. On the 12th of March, 1812, Cockrill had judgment, in the Circuit Court, for $898.60, including costs. On the 25th of May, 1811, before judgment was given in the Circuit Court, Hurt, the complainant, and Reeves, entered into a written contract, in substance, as follows: “ Floyd Hurt shall have all that portion of land tying east of the west prong of Mill Creek (the quantity to be ascertained by survey) at $10 per acre. He shall pay in hand $220, and on or before the 25th day of December next, shall pay $383, which sum shall be appropriated to the payment of a certain sum, wherein John Hoggatt is bound for said Reeves, and has mortgage on the aforesaid premises for the security of a debt, which John Cockrill obtained against said Reeves in the County Court, and which is depending in the Circuit Court of Davidson; $100 in carpenter’s work to be paid in twelve months, and the residue on the 25th of December, 1812. And the said Reeves doth agree and bind himself to make and convey to said Hurt a good warranty deed for said land, so soon as the $383 shall be paid towards the satisfaction of the mortgage to said Hoggatt, wherein said premises are contained. And said Hurt agrees and binds himself to perform said payments. This agreement is not to affect a lease which * J. Bibb has to the premises.” In pursuance of this agreement, Hurt paid $220 in hand, and failed to make the next payment at the time agreed; but on the 23d of March, 1812, a few days after Cockrill had judgment, he paid $500, viz: $200 in cash and his note for $75, paid to C. Bibb, to enable Reeves to purchase from him a negro boy, which boy Reeves immediately exchanged with Cordee for a *556 slave named Solomon. 'And Hurt gave his note, with Reeves his security, to Cordee for $225. The whole payments made and secured that day, amounting to the' sum before named of $500. Whereupon Reeves, the same day, executed a deed with warranty to Hurt, for 92-jL- acres, that being the quantity ascertained by the survey. Some other payments were made, which the complainant alleges amounted in all to $821, the price he contracted to pay, except $100 in carpenter’s work. Reeves says only $741 were paid or secured. In January, 1812, Hurt purchased Bibb’s lease and took possession. Reeves being indebted to Car-lisle, executed his note or bill single to him, with the other defendants to this bill as his sureties. Carlisle commenced suit, and obtained judgment against Reeves in Davidson County Court, at April session, 1812. Judgment by default had been entered against the other defendants, in the preceding January, for nearly $700. On ,the 13th of April, 1812, Reeves sold and made a deed to James Owens, for 50 acres of the adjoining land, including 10 acres which had before that time been purchased and paid for by R. Owens ; and paid for 40 acres by sundry payments after that time. Writs of execution were issued on both judgments, and levied on the whole tract of land sold by Reeves to Hurt and to Owens ; which was sold by the sheriff, and Owens become the purchaser for $830, and has received a deed from the sheriff. Hurt attended the sale with the intention of bidding, but could not procure * money. He did not make known his claim at the sale. Hurt filed this bill against Reeves and the other defendants, who were sureties in the note on which Carlisle obtained judgment, and prays to be quieted in his title to the land, or to receive compensation ; alleging that Solomon, who was purchased from Cordee, was procured by the advances or payments made by him for the land, and for the express purpose of satisfying Cockrill; that Reeves put him into the hands of Sneed for that purpose. But his value when sold was not so applied. Part of it even was expended in discharging Carlisle’s judgment, and with full knowledge of all the circumstances of the contract between Hurt and Reeves. The defendant, Reeves, denies that he ever agreed to apply the negro Solomon to the discharge of Cockrill’s judgment. The other defendants admit the delivery to Sneed, a sale made, and the application of the value as stated ; but expressly deny any knowledge of the contract respecting that matter between Reeves and Hurt.
*557 No proof is produced authorizing the conclusion that Sneed or Owens knew of the agreement respecting the application of the payments made by Hurt. On that ground, they appear not to have been guilty of any fraud or misapplication of the money. But the case is otherwise as respects Reeves. By express contract, the second payment made by Hurt was to be applied to the discharge of Cockrill’s judgment; and a deed with general warranty was to be executed when that payment should be made ; and though Hurt failed on the day stipulated, yet in a few months afterwards the payment was made, and to a greater amount than stipulated. This must be taken, and even so considered at the time, as a payment on the former contract. Else why was the deed for the land executed ? Reeves acted with bad faith in not making the application of the proceeds of the sale of the negro, as he was bound to do, and as to him the complainant ought to be indemnified. * Now what are the legal conclusions upon this statement of facts ? No judgment being in existence, Reeves mortgages 110 acres to his sureties, in the appeal for their indemnity. They had the legal estate, and Reeves only the equity of redemption, which is not liable to be sold on a fi. fa. When he sold and conveyed to Hurt, that gave the equity of redemption to Hurt. Cockrill had judgment in the Circuit Court against Reeves; that was no lien on the land, for neither a legal nor equitable title was in Reeves. Owens purchased at the execution sale, and like him had nothing so far as concerned the 921? acres sold to Hurt. Owens paid the judgment of Cockrill, which but for this payment Cockrill would have forced from the mortgagees, and they again from the 110 acres mortgaged to them. Owens, therefore, has a right to stand in place of the mortgagees, ánd to force from Hurt his proportion of the money paid in satisfaction of Cockrill’s judgment, that is in proportion as 92^ acres are to 50. And the amount thus paid by Hurt he has a right to .recover against Reeves, who received and misapplied it, thereby leaving Hurt exposed to the mortgages. As to Speed, he received the negro from Reeves, and applied the amount as directed, and is not accountable to any third person; he must therefore be discharged. The mortgagees having been indemnified, ought to convey to Hurt 92tV acres, and 18 acres to Owens. Hurt must pay to Owens his proportion of Cockrill’s judgment, and recover the same against Reeves, after deducting therefrom whatever sum remained due by him to Reeves on their contract.
*558 It is objected, however, that an. equity of redemption is liable to be sold by fi. fa.; and New York cases are cited in support of the position. 1 Caines, 47; 4 Johnston, 41. The decisions in these cases are referable to the general exposition and practice that prevailed * in that State under the act of the 5th of George the Second, ch. 7, which has in it the words real estate, which the people of New York took to extend to all real estates in equity as well as at law. The title of the act is “ An act for the more easy recovery of debts in his majesty’s plantations and colonies in North America.”
“ § 4. And be it further enacted by the authority aforesaid, that from and after the. said 29th day of September, 1782, the houses, lands, negroes, and other hereditaments and real estates, situate or being within any of the said plantations, belonging to any person indebted, shall be liable and chargeable with all just debts, duties, and demands of what nature or kind soever, owing by any such person to his majesty, or any of his subjects, and shall, and may be assets for the satisfaction thereof, in like manner as real estates are by the law of England liable to the satisfaction of debts due by bond or other specialty, and shall be subject to the Wee remedies, proceedings, and process in any court of law or equity in any of the said plantations respectively, for seizures, extending, selling, or disposing of any such houses, lands, negroes, and other hereditaments and real estates, towards satisfaction of such debts, duties, andj demands, and in like manner as personal estates, in any of the said plantations respectively, are seized, extended, sold, or disposed of for the satisfaction of debts.” And this interpretation of the act was afterwards confirmed in that State by an act of the Legislature. Before this statute the elegit, being a statutory writ issued by courts of law, extended only to such subjects as the law recognized ; so did the fi. fa. Of course not to such estates as were only recognized and protected in equity. Trust estates, whether created by express contract, and remaining in the persons to whom limited, or resulting from these express contracts, or * whether they were trusts raised in equity upon the misconduct of defendants converted into trustees for the purpose of affording to the party injured the necessary and proper relief, which could.be best founded upon the idea of his being a trustee, were not subject to these writs of execution. *559 Also, these writs of execution did not extend to any equities raised by courts of equity to prevent injustice from too much adherence to rules of law. These indeed were real estates, as much fortified and secured by rules of equity as real estates at law were in courts at law, yet still not amenable to creditors. This called for amendment. The Parliament, by the 29th of Charles II. ch. 8, §§. 10, 11, applied the remedy. It declared trusts liable to execution. The judges were then called on to say what trusts were intended. They confined the operation of the statute to trusts expressly created and remaining- in the person named as cestui que trust, or selling by operation of law from conveyances made by the party. Other trusts not thus created nor resulting, but imagined in courts of equity for the sake of persons injured, were not included; nor were equities of any sort included that were raised by the rules of equity to prevent a wrong. Under this description fall equities of redemption. All these equities created by courts of equity, were left as before by the statute, and have not since been provided for. The act of George II. was not extended to them in North Carolina by contemporaneous exposition. It was passed in 1732, when North Carolina was in its earliest stages of infancy, and perhaps few if any such subjects for the act to operate upon. The act of 1784, ch. 11, also the act of 1786, hath the term real estates, yet they have not been construed to extend further than the same words used in the act of George II. Had there been any such construction under the act of George, it would be our duty now, as did the judges of New York, to follow that construction. There being none such, we * ought to hesitate before we go so far as to say that an equity of redemption is liable, for the- next thing would be for us to say that all equities are, and that will introduce equities raised for the purpose of complete equitable remedies, where the trust is said to exist upon some wrong, deceit, or injustice of the trustee, who never did agree that an use or trust should arise from his express assent. What a field of difficulties and controversies does this lead into? What -will be the final issue we know not. We had better leave it to the wisdom of the Legislature, going as far as statutory provisions authorize us, but no further till directed by the Legislature. Very probably they will subject equities of redemption, and perhaps some others; but it is probable also that there are many equities, which they -will not in- *560 elude in the catalogue. 1 Ves. junior, 431; 8 East, 467, 486; 3 Atk. 200, 739; 3 Bro. Ch. Cases, 480.
As to the objection that personal property was included in the mortgage, as well as the lands, and that Owens ought to have the benefit of it, as he is to stand in the place of the mortgagees, consider how they would have stood had they left this personal property in the hands of the mortgagor and he had become .insolvent. Having disposed somehow or other of this personal property, the mortgagees have no right to follow it into the hands of the purchaser, and cannot afterwards defeat the sale. So neither can Owens stand in their place. Take another view. Hurt stands in the place of Reeves, being his assignee; could Reeves say to the mortgagees, The personalty I have disposed of, you must look to the purchaser before you can resort to the land ? Certainly he would not be permitted to say so; neither can Hurt. Still, therefore, to this time he is estopped to say that Owens, standing in the place of the mortgagees, shall be forced upon the personal property. 1Ves. 348. Here the mortgage was registered, whether within the time * prescribed by law cannot be ascertained, for the place which the date should have occupied is blank, that is as to the month and day. It must be taken, then, as not registered in time, and therefore to be ineffectual as against subsequent purchasers. Had it been registered in time, the circumstance of possession in the mortgagor, as this case is, being an indemnity to sureties not yet injured nor compelled to pay anything for their principal, would not require a delivery of the property to the mortgagees, but would have been consistent with the design of the parties and of the contract itself. Powell on Mortgages, 41, 42. It is true indeed, that, as between the heir and executor, the personal estate shall in general exonerate the real, unless the personal be exempted by the will of the testator, but in the case of the mortgagor himself he is master of both, and may do as he pleases ; and certainly, by disposing of the personalty, he has taken his choice to throw the whole upon the realty. And with respect to the as-signee of the equity, he has taken it either after the personalty was disposed of, or before. If before, he has left the personalty in the power of the mortgagor, and has depended upon him. He ought not, therefore, to complain, as against one who did not trust to him at all; and insist that the burden shall be thrown upon the latter. *561 So, taking it either way, the land is liable, and ought to pay its proportion. As to the 88 acres not mortgaged, but sold to Owens, these were liable to Cockrill’s judgment, having been first rendered, and afterwards to Carlisle. So much as was raised by it should first be applied to that judgment, and the residue be proportioned as 92 is to 18. Owens, who purchased, ought then to stand in the place of Carlisle, and to apply the balance that is coming out of his purchase money for the equity to the satisfaction of Carlisle’s demand.
Decree accordingly ; and let it be referred to the master to report how much remained due from Hurt to Reeves on their contract ; how much was * raised by the sale of the 38 acres not mortgaged, and, after deducting the same from Cock-rill’s judgment, to report what is the amount of the balance. Let him also report what is the amount of Hurt’s proportion of the balance, being the same as the proportion of 92 acres purchased by Hurt compared with the 18 acres purchased by Owens.
See Hannum v. Wallace, 4 Hum. 143; Combs v. Young, 4 Yer. 218; Elliott v. Patton, 4 Yer. 10; Russell v. Stinson, 3 Hay. 1, and note sub fin.; King’s Digest, 6390, 6601, 6602.